# Montgomery et al. v. Pennsylvania Ry. Co.

Feb. 16, 1940.

Thomas C. Mapother for appellants.

Crawford, Middleton, Milner & Seelbach for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On January 19, 1937, the plaintiffs below and appellants here, A. S. Montgomery and C. A. Montgomery, doing business in the firm name of Montgomery & Company, caused to be delivered to the St. Louis and San Francisco Railroad Company at Oklahoma Stock Yards in the State of Oklahoma, 102 calves to be transported by rail from that point to plaintiffs in the city of Louisville, Kentucky. The initial carrier issued to the consignor, W. H. May, a through bill of lading showing the consignees to be plaintiffs at Louisville, Kentucky. It also designated the lines of railway covering the entire shipment and which were the initial carrier over its line of railway to that of the next connecting carrier, which was the St. Louis Southern Railway at East St. Louis, Illinois, from which point the latter carrier was to transport the shipment to Louisville, Kentucky, its destination.

The shipment was carried by the initial carrier with due dispatch and with proper care and handling to East St. Louis, Illinois, the terminus of its line covering the entire distance of the shipment. The cattle was unloaded and cared for at that point at some stock yards located there, and in due time was prepared for a con-

tinuation of the journey over the connecting carrier named in the bill of lading, and which was on January 21st, two days following the day of the shipment, but only about 27 hours of that time was consumed in transporting the consignment from Oklahoma City to that point by the initial carrier. By the time the movement was ready to be resumed at East St. Louis, Illinois, the succeeding and delivering carrier (St. Louis Southern Railway) learned that portions of its track between that point and the destination of the shipment (Louisville, Kentucky) were washed away on account of the then unprecedented flood from the Ohio river and its tributaries, and that other portions of its track within the flooded territory were inundated from the flood so as to render it impossible for it to make the delivery of the shipment. The bill of lading stipulated that: "Every liability incurred in connection with said shipment shall be subject to all the conditions, whether printed or written, herein contained, including the conditions on the back hereof, and which are agreed to by the shipper and accepted for himself and his assigns."

One of the printed conditions was, "Every carrier shall have the right in case of physical necessity to forward said live stock by any carrier or route between the point of shipment and the point of destination."

Pursuant to the right, so given, the St. Louis Southern Railway Company, on account of the stated physical necessity therefor, arranged with the Louisville & Nashville Railroad Company to take its place in the bill of lading as the delivering carrier from East St. Louis, Illinois, to Louisville, Kentucky. The substituted carrier then took charge of the shipment and carried it from East St. Louis, Illinois, to Evansville, Indiana, where it arrived in due time and according to schedule with no proof of improper handling—the arrival in that city being late in the afternoon of January 21, 1937. On that day the precipitation of rain in the flooded area was more than the average precipitation for the entire month of January—as disclosed by the government records for years past—and by that time the tracks of the Louisville and Nashville Railroad Company on portions of its route from Evansville, Indiana, to Louisville, Kentucky, were in the same condition as that of the St. Louis Southern Railway Company—so much so as to prevent

it from carrying the shipment to its destination. Not only so, but the undisputed proof shows that telephone and telegraph lines from Evansville, Indiana, into Louisville, Kentucky, had likewise been put out of commission by the flood so that no messages could be transmitted to the consignees in Louisville, Kentucky, informing them of the conditions.

In the circumstances, the Louisville & Nashville Railroad Company delivered the shipment to a stock yards company in Evansville, which took charge of the cattle and looked after them with the rendition of such services as are usual and customary in the circumstances. They remained in that custody for about two and a half days, following which the carrier was able to and did notify plaintiffs of the conditions and it received instructions to consign and ship the cattle to Tarr-Downs Company at Indianapolis, Indiana, "by way of the best available route." Pursuant to that direction the cattle were loaded and transported by an initial carrier from Evansville, Indiana, to Terre-Haute, Indiana, and from thence by the defendant, Pennsylvania Railway Company, to Indianapolis, Indiana—each of which trips were made on schedule time and the proof shows, beyond contradiction, without rough handling or other contractual or other violations of duty.

A few head of the cattle were dead when the shipment arrived in Indianapolis from exposure incident to the condition produced by the flood through and by which all delays were produced. Also some of the cattle making up the total shipment were more or less emaciated and gaunt, by reason of which their value was decreased. This action was thereafter filed in the Jefferson circuit court by plaintiffs against defendant and appellee, the delivering carrier, to recover damages alleged to have resulted from negligence on the part of the various carriers handling the shipment, which amounted, according to plaintiff, to the sum of $1,000—for which it sought judgment.

Defendant answered denying the negligence averred in the petition, and in a second paragraph it pleaded the conditions hereinbefore outlined as an excuse in law for the delay complained of, which it averred was due solely to the unprecedented flood, an act of God. Following testimony produced by both sides the court sustained de-

fendant's motion for a directed verdict in its favor, pleadings made the issues and at the conclusion of the which the jury returned, followed by a judgment dismissing the petition—to reverse which plaintiffs prosecute this appeal. It, therefore, will be seen that the only question for determination is whether or not under the testimony the court was justified in giving the peremptory instruction complained of, and which, of course, is determinable from the testimony heard at the trial?

Brief of learned counsel for appellants relies almost exclusively upon the delay of the carriers in notifying plaintiffs of the conditions prevailing in Evansville, Indiana, when the shipment arrived at that point over the Louisville & Nashville Railroad Company, and which counsel insist was the chief contributing fact to the injured condition of the cattle when they arrived in Indianapolis, Indiana. However, that surmise on the part of counsel is contradicted and disproven by witnesses who testified concerning the delay and the handling of the cattle from the inception of the shipment, and which testimony is nowhere contradicted. Moreover, the shipment, as we have said, was composed of more or less youthful calves. They, no doubt, had been gathered immediately before shipment from enclosures allowing proper amount of exercise, and where conditions were much more conducive to the betterment and prservation of their physical condition than while traveling in railroad cars, or confined in encompassed stock yards, howsoever much care might be bestowed on them while in the latter condition.

Apart from that fact, however, it is undisputably shown that the unprecedented flooded condition of the country at that time had resulted in destroying all means of rapid or quick communication between Evansville, Indiana, and Louisville, Kentucky, so as to prevent the Louisville & Nashville Railroad Company from notifying plaintiffs, as consignees of the shipment, of the facts any sooner than it did so. Also, that when it succeeded in giving that notice it immediately proceeded without delay to carry out instructions of the consignees, which was done with reasonable dispatch, accompanied with the observance of the proper care imposed by the law. To meet and avoid that condition of the proof—and especially all of it relating to the han-

dling of the cattle constituting the shipment both while en route and during delay in stock-yards—learned counsel for plaintiff cite us to many cases, some of which were rendered by this court, wherein it was held that under the testimony adduced in them a directed verdict in favor of the defendant carrier was improper. But in each and every one of them the damage to and upon the shipment was such as could not have been produced by mere delay, or by any other cause than rough, improper and illegal handling, and which induced this—and the other courts so holding—to conclude that the issue of improper handling en route should have been submitted to the jury.

The proof in this case, however, presents no such facts forming the basis of the court's conclusions in the cases relied on, since the condition of the cattle when the shipment arrived in Indianapolis, Indiana, was not such as to indicate that it could not have been produced by mere delay; or produced by rough handling, or other violations of the carrier's duty in transporting such freight. Furthermore, in the cases relied on there were proven facts and circumstances from which negligence could easily be inferred in contradiction of the carrier's express testimony disproving it. We find no such circumstances in this case, but on the contrary the proof clearly shows that all of the delay was produced by the act of God in furnishing the flood, which in turn physically disabled the carriers from promptly performing their contract or discharging other duties in giving notice, etc.

Independently of the testimony of witnesses in this case, the January, 1937, flooding of the Ohio river and its tributaries was and is an event of which this court can take judicial knowledge, and when done it is made to appear that the extent of the flood throughout that territory ranks perhaps second to that experienced by Noah in early Biblical times, since it surpassed all previous records kept by the Federal Government from the the time it began to do so for a period of more than fifty years preceding it, and, of course, surpassed any previous like catastrophe within the recollection of the oldest inhabitants. The law does not require even common carriers to perform the impossible when their inability is not contributed to by them. In such cases the

loss must fall upon the one who unfortunately sustains it and not borne by the one who could not prevent it. The case made out by the testimony was and is undoubtedly one governed by the principles stated, and the court did not err in so holding.

Wherefore, the judgment is affirmed.